Larry W. Lee (State Bar No. 228175)
lwlee@diversitylaw.com
Nicholas Rosenthal (State Bar No. 268297)
nrosenthal@diversitylaw.com
**DIVERSITY LAW GROUP, A Professional Corporation**
515 S. Figueroa St., Suite 1250
Los Angeles, CA 90071
(213) 488-6555
(213) 488-6554 facsimile

WILLIAM L. MARDER, ESQ. (CBN 170131)
**Polaris Law Group LLP**
501 San Benito Street, Suite 200
Hollister, CA 95023
Tel: (831) 531-4214
Fax: (831) 634-0333
Email: bill@polarislawgroup.com

Attorneys for Plaintiff and the Class

(Additional Counsel on Next Page)

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC CHAVEZ, as an individual and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CONVERSE, INC., a Delaware corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 15-cv-03746-NC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT CONVERSE, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST THE CERTIFIED CLASS**<br><br>Date: October 4, 2017<br>Time: 1:00 p.m.<br>Courtroom: 7, 4th Floor<br>Judge: Hon. Nathanael M. Cousins |

1

PLAINTIFF'S OPPOSITION TO DEFENDANT CONVERSE, INC.'S MOTION FOR SUMMARY JUDGMENT
AGAINST THE CERTIFIED CLASS
Case No. 15-cv-03746-NC

Dennis S. Hyun (State Bar No. 224240)
dhyun@hyunlegal.com
**HYUN LEGAL, APC**
515 S. Figueroa St., Suite 1250
Los Angeles, CA 90071
(213) 488-6555
(213) 488-6554 facsimile

# TABLE OF CONTENTS

I.   INTRODUCTION....................................................................................................... 1

II.   THE CRANDALL STUDY IS RIDDLED WITH INCONSISTENCIES AND IS

BASED ON AN INSUFFICIENTLY NARROW WINDOW OF TIME................................. 2

   A.   The Crandall Study Is Flawed Because It Takes Data Collected Over A Two Week

   Span At The End Of The Class Period And Applies It To The Nearly Six Year Period

   Prior ......................................................................................................................... 2

III.   NINE OF DEFENDANT'S OWN LONG-TIME EMPLOYEE'S TESTIFIED THAT

THE SECURITY CHECK PROCESS TOOK OFTEN A MATTER OF MINUTES........... 4

IV.   WHETHER THE FEDERAL *DE MINIMIS* DOCTRINE APPLIES TO

PLAINTIFF'S CALIFORNIA LABOR CODE CLAIMS IS UNDER REVIEW BY THE

CALIFORNIA SUPREME COURT ...................................................................... 11

V.   DEFENDANT HAS FAILED TO CARRY ITS BURDEN ON SUMMARY

JUDGMENT.......................................................................................................... 15

VI.   DEFENDANT HAS FAILED TO ESTABLISH THAT THE *DE MINIMIS* DEFENSE

APPLIES .............................................................................................................. 16

   A.   The California Labor Code Is Not Hospitable To The *De Minimis* Defense............. 17

   B.   It Would Not Be Administratively Difficult For Defendant To Capture The Unpaid

   Work Time At Issue In This Suit................................................................... 19

   C.   Defendant Has Presented No Evidence Regarding The Aggregate Amount Of

   Unpaid Time At Issue ........................................................................................ 23

   D.   There Can Be No Dispute That The Unpaid Time At Issue Is Regularly Incurred . 24

VII.   CONCLUSION ............................................................................................... 24

i

PLAINTIFF'S OPPOSITION TO DEFENDANT CONVERSE, INC.'S MOTION FOR SUMMARY JUDGMENT
AGAINST THE CERTIFIED CLASS
Case No. 15-cv-03746-NC

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Acasio v. Lucy*, 2017 U.S. Dist. LEXIS 54692, at *44 (N.D. Cal. Apr. 10, 2017) ...................... 15

*Alvarado v. Costco Wholesale Group*, 2008 U.S. Dist. LEXIS 48935 at *9 (N.D. Cal. June 18, 2008) ................................................................................................................. 18, 20, 21

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 691 (1946) ................................................ 11

*Bernstein v. Virgin Am., Inc.*, No. 15-CV-02277-JST, 2017 WL 57307, at *11 (N.D. Cal. Jan. 5, 2017) ...................................................................................................................... 12

*Bouaphakeo v. Tyson Foods, Inc.*, 2011 U.S. Dist. LEXIS 86437 at *31 (N.D. Iowa Aug. 4, 2011) ................................................................................................................................... 21

*Brewer v. Gen. Nutrition Corp.*, 2014 U.S. Dist. LEXIS 159380 at *4 (N.D. Cal. Nov. 12, 2014) ................................................................................................................................ 22

*Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1079 (9th Cir.2016) ........................................................................................................................... 17, 18

*Eddings v. Health Net, Inc.*, 2012 U.S. Dist. LEXIS 51158 (C.D. Cal. March 23, 2012) at *18-19 ........................................................................................................................... 17, 19

*Estate of Naharro v. Cty. of Santa Clara*, 2016 U.S. Dist. LEXIS 148383, at *1 (N.D. Cal. Oct. 26, 2016) ................................................................................................................ 15, 16

*Faron v. St. Joseph Hosp.*, 2008 U.S. Dist. LEXIS 111564, at *2-3 (N.D. Cal. Nov. 4, 2008)... 16

*Frlekin v. Apple Inc.*, 2015 U.S. Dist. LEXIS 151937, *10-*30 (N.D. Cal. Nov. 7, 2015) ......... 14

*Frlekin v. Apple, Inc.*, 2017 U.S. App. LEXIS 15372 (9th Cir. Aug. 16, 2017) ................... 14, 15

*Gillings v. Time Warner Cable, LLC*, 583 Fed. Appx. 712, 715 (9th Cir. 2014) ....... 17, 19, 21, 24

*Goldman v. Standard Ins. Co.*, 341 F.3d 1023, 1036 (9th Cir. 2003).......................................... 16

*Green v. Lawrence Serv. Co.*, 2013 U.S. Dist. LEXIS 1092 at*19-20 (C.D. Cal. July 23, 2013) 18

*Greer v. Dick's Sporting Goods, Inc.*, 2017 U.S. Dist. LEXIS 57165 (E.D. Cal. April 12, 2017) ................................................................................................................................... 21

*Hubbs v. Big Lot Stores, Inc.*, 2017 U.S. Dist. LEXIS 85227 at *22-24 (C.D. Cal. May 12, 2017) ................................................................................................................................ 18

*Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 518, 190 L. Ed. 2d 410 (2014) ................. 14

*Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984) ........................................... passim

*Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1107 (9th Cir. 2000)............. 15

*Pena v. Taylor Farms Pac., Inc.*, 2015 U.S. Dist. LEXIS 15450 at *10 (E.D. Cal. Feb 3, 2015)17, 18, 19, 24

*Quezada v. Con-Way Freight, Inc.*, 2013 U.S. Dist. LEXIS 189954 (N.D. Cal. Dec. 16, 2013) at *8-9 ..................................................................................................................................... 19

*Troester v. Starbucks Corp.*, No. 14-55530, 2016 WL 8347245, at *3 (9th Cir. June 2, 2016).. 12, 14, 17, 19

*Wren v. RGIS Inventory Specialists*, 2009 U.S. Dist. LEXIS 74789 at *83-84 (N.D. Cal. Aug. 24, 2009) ................................................................................................................................. 24

**State Cases**

*Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 262 (2016) ................................. 11, 12, 13, 15

*Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012).................................................. 12

*Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 526-528 (2009).......................................... 19, 24

*Mendiola v. v. CPS Security Solutions, Inc.*, 60 Cal. 4th 833 (2015) .......................................... 12

*Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 582 (2000) ..................................................... 14

*Murphy v. Kenneth Cole Prod., Inc.*, 40 Cal.4th 1094, 1103 (2007)........................................... 12

*See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889 (2012) ................................. 13

**State Statutes**

Labor Code § 226.7........................................................................................................................ 13

**Federal Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................................... 15

## I.     INTRODUCTION

While Defendant tries to convince the Court that Plaintiff's lawsuit is predatory, Defendant's Motion has a cruel irony to it.  Defendant, in a supposed effort to prevent its employees from stealing its goods, ends up stealing wages from the employees instead.  Then, when confronted about this stealing of wages, Defendant dismisses the theft as being too small on an individual level for the employees' to recover the wages.

Of course, the very premise of Defendant's Motion, that the time in question is *de minimis*, is a fiction created by Defendant.  Defendant's entire argument is based on a purported "study" performed by its expert – Robert Crandall ("Crandall Study"), with the majority of that study coming from video footage that its expert's observers watched.  As will be further discussed herein, the Crandall Study is drawn from observations covering such a narrow slice of the class period that it cannot be used to determine what the security check experience was like over the entire class period.  As an illustration of this point, the Crandall Study includes data from a grand total of 27 "store days" (days when an individual location is open) out of over 39,000 in the class period.

Further, the sworn deposition testimony of nine long-time employees of Defendant show that the security check process frequently took a matter of minutes.  This testimony was obtained via deposition of randomly selected class members, some of whom are still current employees of Defendant.  All nine of the class members are individuals who worked for Defendant for at least two years, and collectively their employment covers the entire class period, and who have undergone countless security checks as a result of their long time employment.  The brunt of their testimony is that security checks often took a matter of minutes.  Not only does this testimony cast doubt over the findings of the Crandall Study, but this is substantial evidence that the security checks performed over the course of class period were not *de minimis*.

Finally, Defendant's Motion fails to perform a substantial analysis of the *de minimis* factors established in *Lindow*.  Instead, Defendant dwells nearly exclusively on the Crandall Study's findings on the amount of time each individual check took.  Otherwise, Defendant has failed to produce any other evidence in support of the actual *de minimis* factors.

**II.     THE CRANDALL STUDY IS RIDDLED WITH INCONSISTENCIES AND IS BASED ON AN INSUFFICIENTLY NARROW WINDOW OF TIME**

Plaintiff retained Brian Kriegler, Ph.D. of Econ One Research, Inc. to evaluate the Crandall Study.  (Declaration of Brian Kriegler Ph.D. ("Kriegler Decl.") ¶ 2).  After reviewing Mr. Crandall's declaration, deposition transcripts of several of Mr. Crandall's "observers" and numerous class members, the raw data collected in conjunction with the Crandall Study, and other case documents, Dr. Kriegler determined that the Crandall Study was too narrow in terms of scope of time to be applied to the entire class period.  (*See generally* Kriegler Decl.)  For a complete list of the documents upon which Dr. Kriegler based his opinion, please see Exhibit 2 to his Declaration.

**A.     The Crandall Study Is Flawed Because It Takes Data Collected Over A Two Week Span At The End Of The Class Period And Applies It To The Nearly Six Year Period Prior**

The Crandall Study is based entirely on a review of security checks from ten Converse locations from 27 days of video and in-person observation.  (Crandall Decl. ¶¶ 33, 62).  To be clear, the Crandall Study did not even look at the selected locations for the entire 65-day period Mr. Crandall claims to have sampled from, but only a small two-week window between May 17 through May 31, 2017 of this alleged 65-day period.  (Kriegler Decl. ¶¶ 21-22).  Further, each store involved in Crandall's Study was observed for only three days.  (Kriegler Decl. ¶ 17).  Despite this narrow sample, Defendant argues that the results of the Crandall Study can be applied to every class member and extrapolated out across the entire class period dating back to July 2011.  Defendant has presented no evidence that this inference is correct.  (Kriegler Decl. ¶¶ 21-24).

Because the observations performed for the Crandall Study were done exclusively in the last two weeks of May 2017, at absolute best, the Crandall Study can be viewed as a study of security checks performed in those two weeks, and nothing more.  (*Id.* ¶ 24).  Moreover, there is no evidence that the actual days selected for observation were randomly chosen.  (*Id.* ¶ 21).  Indeed, Mr. Crandall has not provided any evidence as to how days were selected for observation.  It defies belief that the days observed were random considering they all come from

1   two consecutive weeks that is roughly 2 years **after** the filing of the Complaint and 6 years **after**

2   the start of the class period.  (*Id.* ¶¶ 21-24).

3         Defendant could have performed a study that would have been based on security checks

4   from a greater span of the class period, but chose not to do so.  For instance, after the Complaint

5   was filed, Defendant could have randomly selected various days in different months and

6   performed the very same observational study.  Moreover, it is quite perplexing that the Crandall

7   Study used specially-installed video cameras and completely started over with new video

8   footage, when Defendant had all along retained video footage of its retail stores' front entrance

9   through its own security video cameras.  In fact, this Court ordered Defendant to retain certain

10  video footages from its security cameras.  (*See* Dkt. No. 41).  Mr. Crandall could have used such

11  historical footage, but for some unknown reason, refused to do so.

12        Nevertheless, Defendant argues that the results of the Crandall Study can be applied to

13  every class member and extrapolated out across the entire class period.  Defendant has presented

14  no evidence that this inference is correct.  The burden is on Defendant to show that a sample

15  taken from two consecutive weeks within one month can apply to the 75 total months in the class

16  period.  Put another way, the Crandall Study looked at 27 "store days" (meaning days in which

17  an individual store was open) out of a total of 36,360 "store days" over the course of the entire

18  class period.  (Kriegler Decl. ¶ 23).  This comes out to approximately 0.07% of the total "store

19  days", or 1/1460 of the total "store days."  It follows that the number of security checks captured

20  by the Crandall Study follows those same proportions.  Again, this 1/1460 sample does not come

21  from across the class period, but instead all comes from a two-week period at the end of the class

22  period.  In itself, the Crandall Study cannot be relied upon to show that the security check time

23  was *de minimis* for the entire class across the entire six year class period.

24        Defendant will presumably argue that the company policy regarding security checks was

25  the same throughout the class period, thereby justifying extrapolating the Crandall Study

26  observations out to the entire class.  Plaintiff does not dispute that there is one common policy

27  applicable to the class period.  However, Defendant could have adjusted its security check

28  process, particularly after the granting of the class certification, including: changes to manager

training on security checks, changes to non-manager training on security checks, and/or changes in instruction to managers as a result of this or other lawsuits, complaints from employees about security check time resulting in a greater emphasis on speeding the checks up.  Indeed, two class members have testified that Converse has changed its security check procedure to speed up the process after this lawsuit was filed.  (Deposition of Angelica Leano ("Leano Depo.") 29:8-21; Deposition of Stephanie Sanchez ("Sanchez Depo.") 35:6-36:25).[1]  Similarly, the fact that Mr. Crandall's observers were standing at the front of the store and clocking employees could impact the speed at which security checks were taking place on the observation days.

Ultimately, no one knows if the days observed by the Crandall Study can reliably be extrapolated out to the rest of the class period.  Defendant cannot provide any evidence that any such extrapolation is sound.  As the Court will see in Section III, the deposition testimony of class members who worked throughout the class period starkly contradicts the findings of the Crandall Study.  Due to the limited number of days observed and the condensed span of time over which the observations occurred, there is no way of knowing whether the Crandall Study findings can be applied to the entire class period.

## III.   NINE OF DEFENDANT'S OWN LONG-TIME EMPLOYEE'S TESTIFIED THAT THE SECURITY CHECK PROCESS TOOK OFTEN A MATTER OF MINUTES

The deposition testimony of randomly selected class members establishes that the results of the Crandall study are not an accurate reflection of the security check experience for class members over the entire class period.  As this Court will recall, Plaintiff originally requested that he be allowed to take 100 random class member depositions in preparation for trial.  (Lee Decl. ¶ 3).  After much meeting and conferring and opposition from Defendant, this Court allowed Plaintiff to take a total of 25 random class member depositions.  (*See* Dkt. No. 123).  In that regard, Plaintiff proceeded to take such depositions.  (Lee Decl. ¶ 3).  Although the entire set of 25 random class member depositions have not been completed, to date, Plaintiff has completed a number of such depositions.

---

[1] All deposition testimony cited herein is attached to the Declaration of Larry W. Lee, filed herewith, as Exhibits "A" through "J."

As part of such depositions, numerous class members testified that the security check process often took several minutes, and at times reached as high as ten minutes.  These class members testified that, unlike what Defendant would have the Court believe, the security check process was not simply a matter of quickly walking out without breaking stride, but instead involved a substantial amount of off-the-clock time.  Again, this is testimony from class members who worked at various locations throughout California for multiple years within the class period (as opposed to a two-week period in May of 2017).  Though the depositions have not yet been completed, thus far based upon the deposition transcripts that are available, the average for security check time based on the testimony of all such deponents is over two minutes.  (Kriegler Decl., ¶ 33).  Moreover, the minimum number of security checks all such deponents were subjected to would amount to at least 5,998, as all such deponents worked 5,998 collective shifts.  (Kriegler Decl. ¶ 27).  This is more than 10 times greater than the total shifts that were observed within the Crandall study.

**William Castro**

William Castro worked at the Citadel location in Commerce, CA from September 2014 through March 2017.  (Deposition of William Osvaldo Castro ("Castro Depo."), 7:24-8:3, 8:7-9).  Mr. Castro testified that 25-35 percent of his exits from the store involved at least some period of time spent looking for a manager to perform a security check on him after he had clocked out or waiting for a manager to arrive at the front to perform a security check.  (Castro Depo., 17:24-18:14).  Of those occasions when Mr. Castro had to wait for a manager at the front, 25 percent of the time the wait was in the 3-5 minute range, 60 percent of the time the wait was in the 1-3 minute range, and 15 percent of the time the wait was under a minute.  (Castro Depo., 21:5-21:24).

Further, on cross-examination by Defense counsel, Mr. Castro was asked to justify his testimony in light of the Crandall's study's findings and made it clear that the findings did not plausibly reflect his experience working for Converse:

> Q: I'm saying, if that happened on the video, that would have been captured.  And so if that's showing an average of nine seconds –
> A: But you're saying as soon as the manager gets there, right?

1    Q: Waiting time with or without a manager there.
2    A: I don't think that's correct then.
     Q: So you feel that your experiences are different than that study?
3    A: No.  I just feel that that study is probably incorrect.
     Q: Do you have any basis for that belief?
4    A: No.  No comment.  I'm saying, like, from what I have witnessed, you know.
5    Q: Okay.  Is it for yourself or have you witnessed other people?
     A: Yeah.  All my employees.  I mean, all my coworkers that I worked with, like,
6    have waited a good amount of time.

7    (Castro Depo., 64: 16 - 65:9).

8    **Matthew Cornejo**

9        Matthew Cornejo worked at the location in Arvin, CA from July 2015 until January 2017.

10   (Deposition of Matthew Cornejo ("Cornejo Depo."), 11:21 – 12:4).  Mr. Cornejo testified that

11   40-50 percent of the time, security checks took between 2-10 minutes.  (Cornejo Depo., 55:6-

12   19).  Indeed, Mr. Cornejo testified that on 10-15 occasions, he actually had to wait 10 minutes at

13   the front before a manager was available to perform the security check.  (Cornejo Depo., 50:17-

14   25).

15   **Christian Escobedo**

16       Christian Escobedo worked at the location in Santa Monica, CA from February 2012

17   through May 2015.  (Deposition of Christian Escobedo ("Escobedo Depo."), 8:3-7, 8:10-13).

18   Mr. Escobedo testified that he always had to wait at least some period of time at the front of the

19   store for a security check.  (Escobedo Depo., 23:10-18).  75 percent of the time, the security

20   check process took two minutes or more.  (Escobedo Depo., 24:21-24).  For instance, when Mr.

21   Escobedo worked "closing shifts" (meaning the shift at the end of which the employees would

22   prepare the store for closing and then lock the door behind them when they left), the checks

23   would take up to five minutes because of other off-the-clock activities required when closing the

24   store.  (Escobedo Depo., 25:2-20).

25   **Julie Garcia**

26       Julie Garcia worked at the location in Ontario, CA from June 2013 through April 2017.

27   (Deposition of Julie Garcia ("Garcia Depo."), 9:1-5, 9:8-11).  Ms. Garcia confirmed that 78

28   percent of the shifts she worked for Defendant were "closing shifts" (meaning the shift at the end

6

of which the employees would prepare the store for closing and then lock the door behind them when they left).  (Garcia Depo., 10:8-11).  Ms. Garcia testified that half the closing shifts involved spending roughly 5 minutes off-the-clock before exiting, and the other half in the range of 2-3 minutes.  (Garcia Depo., 20:2-8).  While Ms. Garcia testified that not all the time spent off-the-clock before exiting on closing shift was spent literally undergoing security checks, Ms. Garcia also agreed that she was not free to leave the store during this time, but instead had to wait for the manager to perform the security checks, set the alarm, and clear the employees to leave the store.  (Garcia Depo., 36:8-37:3).  Thus, on nearly 80 percent of days, Ms. Garcia waited between 2-5 minutes off the clock before being able to exit the store.

### Angelica Leano

Angelica Leano has worked at the location in San Leandro, CA since November 2015. (Deposition of Angelica Leano ("Leano Depo."), 11:15-21, 11:25-12:5).  Ms. Leano testified that on 30 percent of her exits, she has to wait between two and four minutes for a manager to arrive at the front to perform a security check.  (40:2-42:6; 47:17-48:23).

### Jessica Chin

Jessica Chin worked at the location in San Francisco, CA from June 2013 to early 2016. (Deposition of Jessica Chin ("Chin Depo."), 8:3-10; 9:2-3).  Ms. Chin testified that 10 percent of her security checks required her to wait for a manager, and that the wait time could be up to 5 minutes.  (Chin Depo., 24:25-25:7).  Ms. Chin elaborated on her testimony that waits could be up to five minutes as follows:

> Q: So you think three minutes is the maximum you would ever have to wait, or were there occasions when you needed to wait longer?
> A: There were some occasions, like especially in the summer, it will be super packed in the store, so I would wait probably – I would say it will be no more than five minutes.
> Q: Okay.  But you can  -- you believe that there were times when you waited up to five minutes –
> A: Yes.
> Q: -- for your security check.  Yes?
> A: Yes.

(Chin Depo., 14:3-14).

### Leeann Hannible

7

Leeann Hannible worked at the Arvin location from May 2015 through January 2017. (Deposition of Leeann Hannible ("Hannible Depo."), 10:1-2, 6-13).  Ms. Hannible testified that 30 percent of her security checks required her to wait for a manager to come to the front of the store.  (Hannible Depo., 27:7-11).  The range of time that Ms. Hannible had to wait for a manager to perform a security check was between 1 and 15 minutes.  (Hannible Depo., 27:12-15).  Over half the time Ms. Hannible had to wait, her wait was at least 5 minutes.  (Hannible Depo., 27:16-22).  Notably, Ms. Hannible also testified that she was made late for a second job on three occasions due to Defendant's security check process:

> Q: And how you – when you say fifteen minutes, that is your estimate, right?
> A: Yes.
> Q: A best guess?
> A: Yes.
> Q. So it could have been ten minutes, maybe?
> A: Yes.  It could have.
> Q: I know, like, when I wait for an elevator it feels like forever; right?
> A: Yes.  But I'm pretty sure it was fifteen to ten minutes because I was late for my other job on those days.
> Q: So that happened one time?
> A: That I was late for the job?
> Q: Yeah.
> A: Three times.
> Q: Okay.  You didn't have a clock, though, that you were actually timing the process; correct?
> A: I was looking at my clock because – at my phone clock because it was – it is, like, I have to go.  I have to go.

(Hannible Depo., 36:24-37:21).

**Stephanie Sanchez**

Stephanie Sanchez worked at the Citadel location in Commerce, CA from June 2013 through December 2015 and since then has worked at the Orange, CA location from January 2016 to the present.  (Sanchez Depo. 11:14-25).  Ms. Sanchez testified that while at the Commerce, CA location, on 20 percent of her security checks she would need to wait some period of time for a manager to come to the front of the store.  (Sanchez Depo., 62:13-16).  Ms. Sanchez testified that the amount of time she would need to wait for a manager could be up to five minutes, but that the amount of time varied.  (Sanchez Depo., 63:11-16).  When asked why

it was that managers were not always available to perform security checks at the front, Ms.

Sanchez testified as follows:

> Q: So thinking back to Citadel, you mentioned that the store was very busy.  What
> was your understanding of why it was that managers were not able to always just
> be at the front in order to perform security checks?
> A: Sometimes, for example, there would be situations with customers, with
> customer complaints, handling a situation at the register.  Many of the associates
> that are there are not able to perform returns or exchanges.  Different
> circumstances.  That the manager was on the sales floor running the floor.  So
> there's many situations that happened, especially at that store.  Sometimes they're
> the only manager that's on duty and they have to handle, like, back and forth,
> towards the back.  That store is a crazy store."

(Sanchez Depo., 29:22-30:11).

### Eric Chavez

Plaintiff Eric Chavez also testified about the amount of time he spent going through the

security check process while employed by Defendant.  Mr. Chavez worked at Defendant's

Gilroy location from September 2010 to October 2015.  (*See* Dkt. No. 57-9).  Mr. Chavez

testified that he would have to wait for security checks between 4-18 minutes.  (Deposition of

Eric Chavez ("Chavez Depo."), 42:14-24).

At the time of the submission of this brief, approximately 15 of the 25 class member

depositions have been held.  Additionally, Plaintiff's deposition was held at the start of discovery

in this matter and he testified extensively regarding the length of security checks.  Over half

these people have testified that waiting for undergoing security checks was a common

occurrence, and that the period of waiting frequently lasted minutes.  In total, these individuals,

all of whom worked for Defendant for at least two years, worked at various different locations,

and over more than 6,000 shifts.  (Kriegler Decl. ¶27).  At a minimum, therefore, these

individuals experienced 6,000 security checks (one check each time the employee's shift was

over), dating from the very start of the class period to the present.  In comparison, the Crandall

Study consists of analysis of security checks that occurred within the second half of May 2017

and only encompasses 436 security checks total.

Defendant will most likely argue that these individuals cannot be certain as to the exact amount of time they spent waiting for managers to perform security checks.  However, even Defendant's own declarants confirm that the time for these checks can take 1-2 minutes:

**Vivianna Estrada**

"The closing bag check takes about a minute or two."  Declaration of Vivianna Estrada, Dkt. No. 129-3 at p. 22, ¶ 17.

**Sara Gallegos**

At most, I have never had to wait longer than 60 seconds to have a bag check conducted.  The reason I had to wait this long was because there was no manager at the front of the store at that time and I needed to have one of my associates call the manager to check me out. It took no more than 30 seconds for the manager to come meet me in the front of the store.

The entire bag check process at store closing, from clocking out to the bag check, to leaving the store, takes about one minute. It has never taken more than two minutes total, and that would be in very rare situations.

Declaration of Sara Gallegos, Dkt. No. 129-3 at pp. 2-3, ¶¶ 13, 16.

**David Villalobos**

The bag check process overall has never taken more than 1 or 2 minutes, including the time spent waiting for a manager, if any, and the time spent undergoing the physical bag check or visual inspection.

Declaration of David Villalobos, Dkt. No. 129-3, at p. 87, ¶ 13.

Furthermore, Dr. Kriegler's calculations are from the testimony of class members who worked for Defendant for at least two years, during which time they undergo countless security checks that are repeated on a daily basis, long enough to develop the ability to provide a trustworthy estimate of the amount of time they spent waiting for security checks.

Defendant will most likely also argue that some of the individuals deposed testified that the security check process took only minimal time.  Again, Plaintiff does not deny this.  For the purposes of this Opposition, Plaintiff need only show that there is a genuine [issue of material] dispute as to any material fact" as to whether the time at issue is *de minimis* on a class wide basis.  Here, the deposition testimony from nine long-time Converse employees from locations all over the state establishing that the security checks frequently took minutes creates a dispute as to whether the time at issue was *de minimis*.

**IV.    WHETHER THE FEDERAL *DE MINIMIS* DOCTRINE APPLIES TO PLAINTIFF'S CALIFORNIA LABOR CODE CLAIMS IS UNDER REVIEW BY THE CALIFORNIA SUPREME COURT**

Defendant's entire motion for summary judgment is premised on a doctrine that may not even apply to Plaintiff's California Labor Code claims.  The federal *de minimis* doctrine provides that small increments of unpaid time worked need not be paid if the employer can prove three elements: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work."  *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984).

This archaic doctrine was established by the U.S. Supreme Court in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 691 (1946).  In *Anderson*, the Supreme Court noted that employees need not be compensated for walking between their time clock and their workstations based on this *de minimis* doctrine.  However, this case was decided in 1946, when the Supreme Court noted that "it is generally recognized that ***time clocks do not necessarily record the actual time worked by employees***."  *Id.* at 690 (emphasis added).  It was in this pre-modern technology context that the Supreme Court held that *de minimis* time need not be compensated pursuant to the policy of the **FLSA**:

> Split-second absurdities are not justified by the actualities of working conditions or **by the policy of the Fair Labor Standards Act**. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.  The *de minimis* rule can doubtless be applied to much of the walking time involved in this case, but the precise scope of that application can be determined only after the trier of facts makes more definite findings as to the amount of walking time in issue.

*Id.* at 692 (emphasis added).

However, the *de minimis* doctrine should have no place in modern times where time can be captured to the second.  Further, the *de minimis* doctrine was established as part of the FLSA However, the California Labor Code, was enacted to afford additional protections to employees beyond the FLSA.  As recently explained by the California Supreme Court in *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 262 (2016):

> When construing the Labor Code and wage orders, we adopt the construction that best gives effect to the purpose of the Legislature and the IWC.  Time and again, we have characterized that purpose as the protection of employees—particularly given the extent of legislative concern about working conditions, wages, and

11

hours when the Legislature enacted key portions of the Labor Code.  [Citations].
In furtherance of that purpose, **we liberally construe the Labor Code and wage orders to favor the protection of employees.**

*Id.* (emphasis added)[2]; *see also Bernstein v. Virgin Am., Inc.*, No. 15-CV-02277-JST, 2017 WL 57307, at *11 (N.D. Cal. Jan. 5, 2017) ("[t]hrough FLSA's savings clause, Congress 'made clear its intent not to disturb the traditional exercise of the states' police powers with respect to wages and hours **more generous than the federal standards'**") (emphasis added).

Given California's employee-protective laws, on June 2, 2016, the Ninth Circuit in *Troester v. Starbucks Corp.*, No. 14-55530, 2016 WL 8347245, at *3 (9th Cir. June 2, 2016), certified the question of whether this doctrine applies to California Labor Code claims for the California Supreme Court to decide. As the Ninth Circuit explained:

> The federal *de minimis* rule could be seen as *less employee-protective than California's wage and hour laws and, therefore, at odds with those laws.* [Citations].  For these reasons, we seek the California Supreme Court's determination as to whether the *de minimis* test applies and submit that the answer given by the Court will either dispose of the appeal or determine how the case might proceed were we to remand this putative class action to the district court.

*Id.* at *3.  Thus, the Ninth Circuit acknowledged California's Labor Code is more "employee friendly," as opposed to federal law, including the *de minimis* doctrine.  The California Supreme Court could very well hold that the *de minimis* doctrine does not apply at all to Labor Code claims, especially given that modern technology can track time to the second.  In other words, all of Defendant's *de minimis* case law out of the 9th Circuit pre-*Troester* is moot.  The official stance of the 9th Circuit is that it does not know whether *de minimis* even applies to California Labor Code claims.

The logic of the California Supreme Court's recent decision from *Augustus* would seem to indicate that the *de minimis* doctrine is not applicable under California law.  The issue in *Augustus* pertained to California's Labor Code requirement that all non-exempt employees be provided with a ten (10) minute duty-free rest break for every three and one-half (3.5) hours worked.  *Augustus*, 2 Cal. 5th at 259.  Specifically, while the employer in *Augustus* provided its

---

[2] Citing *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012), *Murphy v. Kenneth Cole Prod., Inc.*, 40 Cal.4th 1094, 1103 (2007), *Mendiola v. v. CPS Security Solutions, Inc.*, 60 Cal. 4th 833 (2015).

1   employees with a ten (10) minute rest break, the employer also required its employees to keep

2   their two-way radios with them in the slim chance that assistance is needed and the employee on

3   the break can be called upon.  *Id.* at 270.  The employees sued, on a class-wide basis, that the

4   mere fact of carrying the two-way radios on their ten (10) minute rest breaks, whether or not a

5   call actually came through during such rest breaks, rendered the rest break as being "on-duty"

6   and, therefore, a violation of Labor Code § 226.7.  *Id.* at 271-72.  The California Supreme Court

7   agreed with the employees, holding that an employer cannot require an employee to do anything,

8   including holding onto their two-way radios, during any portion of the 10 minute rest break,

9   otherwise a violation of Labor Code § 226.7 would occur.  *Id.*

10          At no point in its holding did the California Supreme Court mention that cutting into any

11   portion of a 10 minute rest break would be "*de minimis.*"  Indeed, in many instances, the

12   *Augustus* employees would never receive a call over their two-way radios during the rest break;

13   and yet the California Supreme Court still held that the mere requirement of holding the two-way

14   radio during the 10 minute rest break violates the California Labor Code.  Even though this only

15   involved, at most, 10 minutes of time, and typically no time whatsoever, the California Supreme

16   Court never even considered such violations to be *de minimis*.

17          Another example can be seen in the California Court of Appeals ruling from *See's Candy*

18   *Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889 (2012).  In *See's Candy*, the issue dealt with

19   whether an employer is allowed to "round" an employee's time to the nearest tenth (6 minutes)

20   of an hour.  *Id.* at 892.  While the Court allowed for such rounding, the Court specifically held

21   that rounding would be allowed only in instances where the rounding is used in such a manner

22   "that it will not result, over a period of time, in failure to compensate the employees properly for

23   all the time they have actually worked."  *Id.* at 901.  In that regard, the Court held that where the

24   rounding is fair and neutral on its face – i.e., where the rounding was to the closest tenth of an

25   hour, as opposed to always rounding downwards – such rounding practice would be legal.  *Id.* at

26   907.  At no point did the Court hold that the reduction of even 1 minute per day would constitute

27   as *de minimis*.

28          Finally, in addition to the Ninth Circuit's request for the California Supreme Court to

clarify whether the *de minimis* doctrine even applies in the first place to California Labor Code claims in *Troester*, the Ninth Circuit has also asked the California Supreme Court to weigh in on whether security checks should be paid under California law in *Frlekin v. Apple, Inc.*, 2017 U.S. App. LEXIS 15372 (9th Cir. Aug. 16, 2017).  This shows the marked difference and heightened protection afforded employees under California's wage and hour laws, as opposed to the less protective FLSA. In *Frlekin*, the employer only mandated security checks to take place when the employee voluntarily chose to bring a bag to work – in all other instances wherein the employee did not bring a bag to work, the employee was free to leave the employer's store without any further impediment from the employer, such as a visual inspection.  *Frlekin v. Apple Inc.*, 2015 U.S. Dist. LEXIS 151937, *10-*30 (N.D. Cal. Nov. 7, 2015).  In the underlying District Court ruling, the Court held that because the employee was free to decide whether to bring a bag to work or not, that such a voluntary decision rendered the security non-compensable as the employee was not "under the control" of the employer.  *Id.*  On appeal, the Ninth Circuit certified the question as to whether "time spent on the employer's premises waiting for, and undergoing, required exit searches of packages or bags voluntarily brought to work purely for personal convenience by employees compensable as 'hours worked' within the meaning of California Industrial Welfare Commission Wage Order No. 7."  *Frlekin*, 2017 U.S. App. LEXIS 15372 at *5.[3]

Again, here, the question of control and, thus, compensability, is even more clear, as Defendant does not dispute that it requires all of its employees to undergo a security check regardless of whether the employee brings a bag or not.  Nevertheless, the California Supreme Court's holding in *Frlekin* will undoubtedly impact this case, as the Court may hold that all checks must be paid, including regardless of whether the check is "*de minimis*" or whether the

---

[3] To illustrate this stark difference between California and federal law, the U.S. Supreme Court in *Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 518, 190 L. Ed. 2d 410 (2014), held that security inspections were not compensable under the FLSA because "the screenings were not the 'principal activity or activities which [the] employee is employed to perform.'"  *Id.*  However, unlike federal law, an employee can still recover wages pursuant to California law for any time in which the employee is subject to control of the employer, such as being forced to ride an employer-provided bus (*Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 582 (2000)), or as in this case, being forced to undergo a security inspection.

14

employee "voluntarily" chose to bring a bag to work.  Indeed, as the Court states, while such activities are not compensable under federal law, such activities may be compensable under California law as state law "provide[s] greater protection to workers" than the federal scheme and that "the federal statutory scheme, which differs substantially from the state scheme, should be given no deference" when interpreting California's wage and hour laws." *Id*. at *8.  Interestingly, the Court did not even touch upon any sort of *de minimis* argument.  Based on this, it is clear that this Circuit believes that security checks may in fact be entirely compensable under California law and Plaintiff is confident, given that California Supreme Court's holding in *Augustus*, which held that requiring an employee to carry a radio on a short 10-minute break, such employee is not "off-duty" and should be paid for such time, even if the employee never used the radio.

## V.   DEFENDANT HAS FAILED TO CARRY ITS BURDEN ON SUMMARY JUDGMENT

Summary judgment may only be granted where the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show[ ] that there is no genuine [issue of material] dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the moving party, Defendant has the "initial burden of production."  *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1107 (9th Cir. 2000) ("at summary judgment, a nonmoving party plaintiff has no obligation to produce anything until the moving party defendant has carried its initial burden of production").

As further explained by the Court, "the moving party **must either produce evidence** negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Estate of Naharro v. Cty. of Santa Clara*, 2016 U.S. Dist. LEXIS 148383, at *1 (N.D. Cal. Oct. 26, 2016). Accordingly, because Defendant is moving on its affirmative defense of *de minimis*, "defendant bears the burden of persuasion and production on an affirmative defense." *Acasio v. Lucy*, 2017 U.S. Dist. LEXIS 54692, at *44 (N.D. Cal. Apr. 10, 2017).

15

As an initial matter, Defendant's entire motion for summary judgment is premised on a fatally flawed "expert" report.  Given that Plaintiff has submitted his own expert opinion exposing the flaws of Defendant's expert's opinions, the Court should deny summary judgment. Indeed, Judge Beth Labson Freeman (the Judge presiding over the Nike case) in *Estate of Naharro* denied summary judgment where the plaintiff and defendant offered conflicting expert reports in a "battle of the experts."  *Estate of Naharro*, 2016 U.S. Dist. LEXIS 148383, at *42-43 ("The parties have presented the Court with a classic "battle of experts" which creates disputed facts as to essential elements of Plaintiffs' wrongful death claim. The Court therefore DENIES Defendants' motion for summary judgment on Plaintiffs' wrongful death claim."); *see also Goldman v. Standard Ins. Co.*, 341 F.3d 1023, 1036 (9th Cir. 2003) ("[w]ho is correct in this battle of experts is not for us to decide"; "[w]e do conclude, however, that Goldman's expert evidence is sufficient to deny Standard summary judgment"); *Faron v. St. Joseph Hosp.*, 2008 U.S. Dist. LEXIS 111564, at *2-3 (N.D. Cal. Nov. 4, 2008) ("the Court has a battle of experts before it, and Cordova is not entitled to summary judgment").  Given that the issues in this case and *Naharro* (as well as the Nike case), all involve conflicting expert testimony, summary judgment should be denied from the outset.

At any rate, even if the Court proceeded to the merits of Defendant's motion, Defendant has failed to meet its burden on summary judgment of producing evidence as to each prong of the *de minimis* doctrine.  Therefore, summary judgment must be denied.

## VI.   DEFENDANT HAS FAILED TO ESTABLISH THAT THE *DE MINIMIS* DEFENSE APPLIES

Even if the standard were used in the instant case, Defendant's Motion must be denied. The *de minimis* doctrine as it currently stands provides that small increments of unpaid time worked do not have to be paid if three elements are evaluated: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow*, 738 F.2d at 1063.  Indeed, according to the test as laid out in *Lindow*, the amount of unpaid time in each individual instance is not even one of the factors to be analyzed at all.  Moreover, motions for summary judgment on the basis of *de*

1   *minimis* are routinely denied even where the amount of time at issue is very small.  *See,*

2   *e.g., Gillings v. Time Warner Cable, LLC*, 583 Fed. Appx. 712, 715 (9th Cir. 2014) ("Although

3   the plaintiffs complain of non-payment for periods of time each very short, the circumstance

4   does not justify application of the *de minimis* doctrine without consideration of the two other

5   factors articulated in *Lindow*…"); *Pena v. Taylor Farms Pac., Inc.*, 2015 U.S. Dist. LEXIS

6   15450 at *10 (E.D. Cal. Feb 3, 2015) ("Although [defendant] points to some evidence related to

7   the amount of time it took plaintiff Pena to don and doff…[defendant] fails to carry its

8   evidentiary burden as to the other *Lindow* factors.").  As the District Court held, "**The** ***de***

9   ***minimis*** **exception is not a broad rule granting employees some number of free minutes of**

10  **labor per day**."  *Eddings v. Health Net, Inc.*, 2012 U.S. Dist. LEXIS 51158 (C.D. Cal. March

11  23, 2012) at *18-19 (emphasis added).

12      **A.      The California Labor Code Is Not Hospitable To The *De Minimis* Defense**

13      Defendant cites to a string of cases on pages 13-14 of its Motion standing for the

14  proposition that a *de minimis* analysis has been performed by courts hearing claims being

15  brought under the California Labor Code.  Of course, all these decisions came down prior to the

16  Ninth Circuit's decision in *Troester* certifying the question of whether *de minimis* even exists

17  under the California Labor Code to the California Supreme Court.  Further, the cases selected by

18  Defendant only highlight how loathe courts are to actually find that uncompensated time is *de*

19  *minimis*, and that when they do find time is *de minimis* it is typically in situations very different

20  from the instant case.

21      Defendant first starts by citing to *Gillings v. Time Warner Cable LLC.*  In *Gillings* the

22  Ninth Circuit held that the unpaid time claimed by the plaintiffs was **not** *de minimis*.  *Gillings v.*

23  *Time Warner Cable, LLC*, 583 Fed. Appx. 712, 715 (9th Cir. 2014) ("We thus hold improper the

24  grant of summary judgment on the basis of the *de minimis* doctrine").  Defendant next cites to

25  *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, where there was a finding of *de*

26  *minimis* under very different factual circumstances.   Specifically, the court found that the

27  plaintiff's claim was *de minimis* where the unpaid time at issue occurred due to a violation of

28  company policy by the plaintiff on literally **one occasion** and was for a grand total of **one**

1    **minute of unpaid time**. *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d

2    1069, 1079 (9th Cir.2016).  Next*, Hubbs v. Big Lot Stores, Inc.*, involved a grant of MSJ on the

3    basis of *de minimis* where employees could avoid bag checks altogether by not bringing a bag,

4    and even when an employee did bring a bag, they were not necessarily going to be subject to a

5    bag check.  *Hubbs v. Big Lot Stores, Inc.*, 2017 U.S. Dist. LEXIS 85227 at \*22-24 (C.D. Cal.

6    May 12, 2017).  Obviously, in the instant case, there was no way an employee could avoid a

7    security check, as checks were performed on all exiting employees regardless of whether they

8    had a bag or not.  Further, the *Hubbs* decision will very well hinge on the California Supreme

9    Court's decision in Frlekin as the facts and arguments are identical.

10           The next case cited by Defendant, *Pena v. Taylor Farms Pac., Inc.*, is a decision in which

11   uncompensated time was specifically held **not** to be *de minimis* because even though the time at

12   issue was short, the other *Lindow* prongs weighed against a *de minimis* finding.  *Pena v. Taylor*

13   *Farms Pac., Inc.*, 2015 U.S. Dist. LEXIS 15450 at \*10 (E.D. Cal. Feb 3, 2015).  *Green v.*

14   *Lawrence Serv. Co.* involves an MSJ filed only against the claims of a single plaintiff and *de*

15   *minimis* was applied only to uncompensated time based on five incidents over a three-year

16   period.  *Green v. Lawrence Serv. Co.*, 2013 U.S. Dist. LEXIS 1092 at\*19-20 (C.D. Cal. July 23,

17   2013).  In *Alvarado v. Costco Wholesale Group*, which was not a class action, security checks

18   were required to be performed on the plaintiff **only when she carried a bag:** "People who do

19   not carry bags or who have not purchased merchandise do not have to subject themselves to a

20   security inspection and have no wait at all."[4]  *Alvarado v. Costco Wholesale Group*, 2008 U.S.

21   Dist. LEXIS 48935 at \*9 (N.D. Cal. June 18, 2008).  Moreover, the individuals who performed

22   the bag checks were stationed at the front exit of the store, such that the court found that at most

23   there were **two occasions per year** where the plaintiff may have waited several minutes for a

24   security check.  *Id.*  Finally, *Cornn v. United Parcel Serv. Inc.*, and *Moore v. Ulta Salon,*

25   *Cosmetics & Fragrance, Inc.* are both class certification decisions, not summary judgment.

26           On the other hand, there are a bounty of cases in which courts have denied a motion for

27   _____

28   [4] Once again, this decision may be ultimately overruled in light of its identical facts to *Frlekin*.

summary judgment based on *de minimis* against claims brought under the California labor code. *See Gillings*, 583 Fed. Appx. at 715-716 (denying *de minimis* MSJ brought against claims under the California Labor Code because "Although the plaintiffs complain of non-payment for periods of time each very short, that circumstance does not justify application of the *de minimis* doctrine without consideration of the two other factors articulated in *Lindow* as pertinent to application of the *de minimis* doctrine in wage cases."); *Pena v. Taylor Farms Pac., Inc.*, 2015 U.S. Dist. LEXIS 15450 (E.D. Cal. Feb 3, 2015) at *8-10 ("Although AMI points to some evidence related to the amount of time it took plaintiff Pena to don and doff [equipment], AMI fails to carry its evidentiary burden as to the other *Lindow* factors."); *Eddings v. Health Net, Inc.*, 2012 U.S. Dist. LEXIS 51158 (C.D. Cal. March 23, 2012) at *17-19 (time lost due to rounding held not to be *de minimis*); *Quezada v. Con-Way Freight, Inc.*, 2013 U.S. Dist. LEXIS 189954 (N.D. Cal. Dec. 16, 2013) at *8-9 ("questions of fact" preclude a finding of *de minimis*); *Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 526-528 (2009) (denying *de minimis* MSJ brought against claim for promissory estoppel based on unpaid time by employees making customer calls).

Thus, if Defendant's point is merely that pre-*Troester* courts would sometimes perform a *de minimis* analysis on California Labor Code claims, then Plaintiff does not dispute that. The bigger point, though, is that it a *de minimis* finding is only made on California Labor Code claims where the uncompensated time in question was infrequent and unsubstantial, neither of which exist in the current case.

### B.    It Would Not Be Administratively Difficult For Defendant To Capture The Unpaid Work Time At Issue In This Suit

"The *de minimis* rule is concerned with the practical administrative difficulty of recording small amounts of time for payroll purposes…Employers, therefore, must compensate employees for even small amounts of daily time unless that time is so miniscule that it cannot, as an administrative matter, be recorded for payroll purposes." *Lindow*, 1062-1063. An employer must submit evidence to support a claim of "administrative difficulty." *Gillings*, 583 Fed. Appx. at 715 ("Time Warner offers no evidence whatever of the administrative difficulty of recording the time it takes its employees to complete their start-up sequences.")

Defendant's entire argument regarding the administrative difficulty of capturing the time at issues requires the Court to have absolute faith in the findings of the Crandall Study. However, as already shown, the Crandall Study is plagued with problems.  As Defendant's administrative difficulty argument seems to be premised on the notion that the security check process took "mere seconds" (Defendant's Motion at 16:7-23), if the Court has doubts about the veracity of the Crandall Study, it should find for the Plaintiff on this prong.

Defendant then argues that it would not be feasible to include a time clock location where employees could clock out after the security check.   However, the time clock used by the employees is an electronic keypad that is a mere ten square inches.  (Kiefer Depo. Vol. III 10:14-20, 12:1-4).  In order to clock in or out, an employee need do nothing more than enter in a code into the keypad and then walk away.  (Kiefer Depo. Vol. III 10:14-20, 11:5-17).

Further, Defendant's PMK disclaimed the administrative difficulty of placing a time clock by the front exit cash register by admitting that the only reason to not have the time clocks at the front of the store is because Converse wants to enhance the "customer experience" and not have customers get upset when they see employees clocking out, as opposed to turning around and helping the customer.  (Kiefer Depo. Vol. III 33:11-15, 39:11-41:15).  More importantly, Converse admits that it has the ability to use electronic badge swipe cards to allow its employees to swipe out, which would take only 5-10 seconds for an associate to tap the time clock on the way out of the store, which is just as easy as clocking out at the back of the store.  (Kiefer Depo. Vol. III 41:19-42:12, 42:17-43:19).  However, Converse's PMK testified that the reason Converse does not provide these badge swipe cards is because Converse does not trust 20-year olds to wear these electronic badges on lanyards because they would either lose them, or not want to wear them.  (Kiefer Depo. Vol. III 44:21-47:10).  Indeed, Defendant admitted that it has not tested whether it is administratively difficult to move the time clocks to the front of the store, or allow employees to clock in and out at the POS.  (Kiefer Depo. Vol. III 39:11-40:7).

The two cases cited to by Defendant in support of its claim that a timeclock cannot be moved do Defendant no favors.  *Alvarado* is premised on the idea that the timeclock could not be moved to the exit because employees engage in noncompensable activities like shopping before

exiting the store.  *Alvarado*, 2008 U.S. Dist. LEXIS 48935 at *11-12.  However, in the context of the instant case, it is entirely feasible that a time clock be placed at the front, where an employee would undergo a check, clock out and then go back in to the store to shop if they so desired. The other case cited to by Defendant is the District Court ruling in *Gillings* that was reversed by the Ninth Circuit.

Again, Defendant's PMK testified that Converse has not considered moving the time clocks to the front of the store because: (1) Converse does not want customers getting upset at the sight of seeing an employee use a time-clock to clock out; and (2) Converse does not trust 20-year olds to keep and wear electronic badges for clocking in and out.  (Kiefer Depo. Vol. III 33:11-15, 39:11-41:15, 41:19-42:12, 42:17-43:19).  These reasons, however, have nothing to do with administrative difficulty, as Converse has failed to address the actual technical capability of moving the time clock to the POS.  Instead, Converse dismisses the ability of 20-year olds to keep an electronic swipe badge and that it places the interests of the customer above that of its employees.

Moreover, at least one major retailer similarly situated to Converse has made the decision to place a time clock at the front of the store so that employees can be compensated for security check time.  In *Greer v. Dick's Sporting Goods, Inc.*, 2017 U.S. Dist. LEXIS 57165 (E.D. Cal. April 12, 2017), the defendant-employer (Dick's Sporting Goods, also known as DSG) placed an additional time clock at the front of the store, such that security checks could be performed on the clock: "[a]s of January 2015, DSG began to install a second time clock at the front of the store in response to pending litigation in another case, and employees can now punch out after the security check is complete."  *Id*. at *13-14; *accord Bouaphakeo v. Tyson Foods, Inc.*, 2011 U.S. Dist. LEXIS 86437 at *31 (N.D. Iowa Aug. 4, 2011) ("This problem may easily be solved by strategically placing time clocks near break rooms and/or locker rooms and actually using them to record the time the plaintiffs work. The court's review of the record does not reveal evidence suggesting such an approach is administrative infeasible.").  Here, Defendant could simply add a time-clock to the front of the store, as the retail employer did in *Greer*.

Alternatively, many retailers also permit employees to clock in and out using the cash

register, or "POS" (Point of Sale). *Brewer v. Gen. Nutrition Corp.*, 2014 U.S. Dist. LEXIS

159380 at *4 (N.D. Cal. Nov. 12, 2014) (POS used for clocking in and out).  Similarly, Under

Armour, another major sportswear retailer, and one of Defendant's main competitors, allowed its

employees to clock out from the POS after undergoing a security check. Donnelly Depo. 88:19-

22, 89:2-21.

> Moreover, as Converse's PMK testified, Converse's stores have the cash register next to
or near the exit, with the exceptions of the San Francisco and Petaluma stores.  (Kiefer Depo.
Vol. III 33:3-34:18).  Additionally, Plaintiff has obtained pictures from 14 of Defendant's 23
retail stores currently operating in California.  (*See* Declaration of Alexa Paul ¶¶ 2-3, Exhibit A;
Declaration of Savanna Becker ¶¶ 2-3, Exhibit A).  For each of these selected stores, the pictures
depict the front entrance of the store in relation to the cash registers.  As shown, in nearly every
one of these stores, there is always a long panel of cash registers that are immediately next to the
front entrance.  (*Id.*)  As shown, the cash registers sit on tabletops that are over 10 to 20 feet
wide, which further contain various storage under the tabletops.  (*Id.*)  As the cash registers
themselves are much bigger than Defendant's time clock systems (which is a square ten inches),
and as the cash registers contain much more "confidential/secured" information/documents (i.e.,
customer credit card numbers, cash, employee ID numbers, etc.) than the time clocks themselves,
there is simply no reason why Defendant could not place an additional time clock in the same
vicinity. In such a scenario, the employee could walk to the front, undergo the security check,
and then walk to the nearby POS to clock out before exiting.

> Again, given that Defendant's stores (with the exception of two) have the cash registers
next to the exit, there is no reason why Defendant cannot move the time clocks to the POS and
have the employee clock out after undergoing the check.  Any such argument is belied by
Defendant's own placement of cash registers (which contain much more "confidential"
information) out in the open that are clearly accessible to the general public.

> The other reason provided by Defendant as to why a timeclock could not be at the front
of the store or at the POS is that of "privacy."  However, Defendant is unable to follow up this
claim with any logical argument.  After all, the employee is quickly entering a code into the

keypad, or swiping a badge and walking away.  Indeed, Defendant's PMK testified that Converse has not even considered whether to maintain only a timeclock at the POS, while having associates review any private information on a computer or portal at the back of the house. (Kiefer Depo. Vol. III 26:1-10).  Again, these employees are not entering their social security number, their name, or any other personal information.  It is not believable that "private" information is at risk by placing a keypad, or badge swipe system at the front of the store or POS, which clearly contains much more confidential information such as customers' credit card numbers.

Beyond placing an additional time clock at the front exit, there are multiple other measures Defendant could take in order to ensure that the time spent undergoing security checks is captured.  For instance, Defendant could have security checks performed at the back of stores on-the-clock, after which employees would then clock out and then walk to the front exit of the store, either accompanied or under the watch of a manager.  Alternatively, Defendant could simply add a set amount of time to every employee's paycheck to ensure that it pays the employees for the time spent going through the security check process.  In sum, there is nothing administratively difficult to allow the security checks to be performed "on-the-clock."

Simply put, there is absolutely no legitimate reason why an employer as big as Defendant, is not able to place a small time clock by the front entrance that could easily allow the security checks to be performed on the clock.  The only reason for Defendant's current security check practice to stay in place is so that it can continue to cheat employees out of their wages.

### C.   Defendant Has Presented No Evidence Regarding The Aggregate Amount Of Unpaid Time At Issue

"In addition, we will consider the size of the aggregate claim. Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim… We would promote capricious and unfair results, for example, by compensating one worker $50 for one week's work while denying the same relief to another worker who has earned $1 a week for 50 weeks." *Lindow*, 738 F.2d at 1063.  A "large"

aggregate claim is a basis for denying a motion for summary judgment based on the *de minimis* theory. *Wren v. RGIS Inventory Specialists*, 2009 U.S. Dist. LEXIS 74789 at *83-84 (N.D. Cal. Aug. 24, 2009).

Again, Defendant's argument regarding the aggregate amount of time at issue rests upon the fatally flawed Crandall Study.  If the Crandall Study is not trusted, then Defendant must cede this prong of the *Lindow* test.  Further, it must be noted that Defendant does not even address the prong correctly, and fails to perform any analysis of the aggregate amount of the unpaid time at hand.  Indeed, courts reject *de minimis* motions for summary judgment that focus solely on the individual daily amounts of unpaid time.  *See, Gillings*, 583 Fed. Appx. 712, 715 (9th Cir. 2014); *Pena v. Taylor Farms Pac., Inc.*, 2015 U.S. Dist. LEXIS 15450 at *10 (E.D. Cal. Feb 3, 2015).

Further, *Lindow* makes clear that the time period over which the aggregate amount to be calculated is not merely a pay period, or a single week.  By specifically providing the example of an employee who is not paid a dollar per week over a 50 week period, it is plain that the *Lindow* Court envisioned any calculation of the aggregate amount to include unpaid wages over a long period of time.

### D.     There Can Be No Dispute That The Unpaid Time At Issue Is Regularly Incurred

"Finally, in applying the de minimis rule, we will consider whether the claimants performed the work on a regular basis." *Lindow*, 738 F.2d at 1063.  Evidence of the unpaid work being "regular" supports a finding that the time is not *de minimis*.  *Gomez*, 173 Cal. App. 4th at 528.  There can be no serious claim that the unpaid time at issue is not regular.  As this Court has found, it was Defendant's policy that every class member was required to undergo a security check every time they left the store, meaning that every class member incurred at least one security check per day worked.

## VII.   CONCLUSION

For the above-stated reasons, Plaintiff respectfully asks that Defendant's Motion for Summary Judgment be denied.

1  DATED:  September 6, 2017                DIVERSITY LAW GROUP, P.C.

2

3                                          By:  _____/s/ Larry W. Lee_____
                                                    Larry W. Lee
4                                          Attorney for Plaintiff and the Class

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28