1
2
3
4
5
6

SEYFARTH SHAW LLP
Jon Meer (SBN 144389)
jmeer@seyfarth.com
Sheryl L. Skibbe (SBN 199441)
sskibbe@seyfarth.com
Michael Afar (SBN 298990)
mafar@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:     (310) 277-7200
Facsimile:     (310) 201-5219

7
8

Attorneys for Defendant
CONVERSE, INC.

9

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

13

14

15

16

17

18

ERIC CHAVEZ, as an individual and on behalf of all others similarly situated,

Plaintiff,

v.

CONVERSE, INC., a Delaware corporation; and Does 1 through 50, inclusive,

Defendants.

Case No. 15-cv-03746-NC

[*Assigned to Hon. Nathanael M. Cousins*]

**DEFENDANT CONVERSE, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST THE CERTIFIED CLASS**

Date:          October 4, 2017
Time:          1:00 p.m.
Crtrm:          7 (4th Floor)

Complaint Filed:   July 10, 2015
FAC Filed:          December 4, 2015
Trial Date:          November 27, 2017

19

20

21

22

23

24

25

26

27

28

41010899v.1

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 1

II. THE *DE MINIMIS* DOCTRINE SHIELDS EMPLOYERS FROM LIABILITY FOR TRIVIAL INCREMENTS OF TIME THAT IS NOT COMPENSATED ..................................... 1

    A.  The Ninth Circuit Consistently Has Held That The *De Minimis* Doctrine Applies Under California Law ..................................................................................................... 2

    B.  The California Supreme Court Has Not Eliminated The *De Minimis* Doctrine ................. 2

III. IT IS UNDISPUTED THAT THE EXIT INSPECTIONS AT CONVERSE SATISFY ALL OF THE ELEMENTS OF THE *DE MINIMIS* DOCTRINE ................................................. 3

    A.  It Is Undisputed That There Is A "Practical Administrative Difficulty" Of Recording And Compensating Time For Exit Inspections In Increments Of Seconds ............................... 3

        1.  There Cannot Be A Triable Issue Based On The Technological Feasibility Of Recording Time By The Second ................................................................. 4

        2.  There Cannot Be A Triable Issue Based On The Technological Feasibility Of Moving Time Clocks To Be Closer To The Store Exit ......................................... 4

    B.  It Is Undisputed That The "Aggregate Amount Of Time" Off The Clock For Each Exit Inspection Is Merely Seconds And Certainly Less Than A Daily Aggregate Of 10 Minutes ........................................................................................................... 6

        1.  There Cannot Be A Triable Issue Based On An Aggregate Amount Of Off-The-Clock Time That Is Less Than 10 Minutes Per Day ............................................... 7

        2.  There Cannot Be A Triable Issue Based On Plaintiff's Expert's Calculation Of The "Average Midpoint" Of 144 Seconds, Or Two Minutes And 24 Seconds, Of Off-The-Clock Time ............................................................................. 8

        3.  There Cannot Be A Triable Issue Based On Plaintiff's Expert's Corrected Calculation Of The "Weighted Average Midpoint" Of 114 Seconds, Or One Minute And 54 Seconds, Of Off-The-Clock Time .................................................. 8

        4.  There Cannot Be A Triable Issue Based On Plaintiff's Expert's Corrected Calculation Of The Weighted Average "Low-End" Of 38 Seconds Of Off-The-Clock Time ...................................................................................... 9

        5.  There Cannot Be A Triable Issue Based On A Corrected Calculation Of The "Midpoint" Weighted Average Of 32.52 Seconds Of Off-The-Clock Time ........ 10

        6.  There Cannot Be A Triable Issue Based On Any Time Estimate Offered By Plaintiff's Expert, Because He Admitted That His Calculations Are Not Meant To Be Representative On A Class-Wide Basis ................................................... 11

    C.  It Is Undisputed That The Crandall Study Can Be Extrapolated On A Class-Wide Basis To Show That The Average Amount Of Time Spent For Exit Inspections Is 23.4 Seconds ........................................................................................................... 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.      The Crandall Study Is Representative, Given That The Exit Inspection Procedures Remained The Same During The Entire Class Period.......................................... 12

2.      If This Lawsuit Is Amenable To Class Certification, It Necessarily Means That Common Policies Or Practices Existed Throughout The Class Period, So That The Crandall Study Is Representative Of The Entire Class Period ...................... 13

D.     It Is Undisputed That The "Regularity Of Additional Work" Is *De Minimis*................... 14

IV.    CONCLUSION.................................................................................................................... 15

41010899v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alvarado v. Costco Wholesale Corp.*,
   2008 WL 2477393 (N.D. Cal. June 16, 2008)................................................6, 7

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946)................................................................................3

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...............................................................................12

*Cervantez v. Celestica Corp.*,
   618 F. Supp. 2d 1208 (C.D. Cal. 2009) ...........................................................3

*Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*,
   821 F.3d 1069 (9th Cir. 2016) ...........................................................2, 4, 15

*Gillings v. Time Warner Cable LLC*,
   583 Fed. App'x 712 (9th Cir. 2014) .................................................................2, 3

*Hubbs v. Big Lots Stores, Inc.*,
   2017 WL 2304751 (C.D. Cal. May 12, 2017) ....................................................2, 3, 7

*Lindow v. United States*,
   738 F.2d 1057 (9th Cir. 1984) .................................................................. *passim*

*Rodriguez v. Nike Retail Services, Inc.*,
   2017 WL 4005591 (N.D. Cal. Sep. 12, 2017) .................................................. *passim*

*Rutti v. Lojack Corp., Inc.*,
   596 F.3d 1046 (9th Cir. 2010) .........................................................................7

*Troester v. Starbucks Corp.*,
   2016 WL 8347245 (9th Cir. June 2, 2016) ......................................................2, 3

**State Cases**

*Augustus v. ABM Sec. Servs., Inc.*,
   2 Cal. 5th 257 (2016)...................................................................................2

*Chavez v. Angelica Corp.*,
   2014 WL 6973497 (Cal. Ct. App. Dec. 10, 2014) ............................................6

DEFENDANT'S REPLY MPA ISO MOTION FOR SUMMARY JUDGMENT

41010899v.1

1

**Rules**

2

Fed. R. Civ. P. 30(b)(6)....................................................................................................4, 5

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S REPLY MPA ISO MOTION FOR SUMMARY JUDGMENT

41010899v.1

## I.     INTRODUCTION

This lawsuit is one of two cases involving mandatory employee exit inspections, which were certified as class actions in the U.S. District Court for the Northern District of California.  Summary judgment recently was granted for the employer in one of the cases, and summary judgment now should be granted for the employer in the present case.

In the very recent decision in *Rodriguez v. Nike Retail Services, Inc.*, 2017 WL 4005591 at *17 (N.D. Cal. Sep. 12, 2017), Judge Labson Freeman granted summary judgment against a certified class of hourly employees who worked at Nike retail stores in California, on the grounds that the time spent in exit inspections was *de minimis*.  The facts in the *Rodriguez* case are identical to the facts in this case.

In *Rodriguez*, 2017 WL 4005591 at *1, the employees were subject to "mandatory exit inspection whenever they leave the store" and the exit inspections were "off the clock."  In the present case, the Court found that employees at Converse retail stores in California were subject to the same mandatory inspection policies and practices—"Converse stores are set up such that an employee would necessarily be off-the-clock when a bag check occurs."  (Dkt. No. 89, p. 3.)  Based on the similarities among the two cases, this Court has stated "**my inclination on the *de minimis* argument is to follow Judge Freeman's approach and the *Rodriguez* decision**."  (Class Certification Hearing Transcript, 17:2-4; emphasis added.)[1]

Plaintiff does not—and cannot—identify any material factual differences between the Nike case and the Converse case.  Accordingly, the pending motion for summary judgment should not detain this Court too long.

## II.     THE *DE MINIMIS* DOCTRINE SHIELDS EMPLOYERS FROM LIABILITY FOR TRIVIAL INCREMENTS OF TIME THAT IS NOT COMPENSATED

Plaintiff argues that the *de minimis* doctrine is "archaic" and "should have no place in modern times where time can be captured by the second."  (Dkt. No. 131, 11:9, 22-23.)  Plaintiff further argues that the *de minimis* doctrine "was established as part of the FLSA" and that "the California Labor Code

---

[1] The two lawsuits against Nike Retail Services, Inc. and Converse, Inc. have additional similarities.  In *Rodriguez*, the certified class of hourly employees brought an action against Nike, which is the parent company of Converse.  The certified class of hourly employees in *Rodriguez* is represented by Diversity Law Group, P.C., and the employer is represented by Seyfarth Shaw LLP.  In the present case, the certified class of hourly employees who brought an action against Converse is represented by the same class counsel, Diversity Law Group, P.C., and the employer is represented by Seyfarth Shaw LLP.

1

1  was enacted to afford additional protections to employees beyond the FLSA."  (Dkt. No. 131, 11:23-25.)

2  These arguments have been recently and repeatedly rejected by the Ninth Circuit, as well as the U.S.

3  District Court for the Northern District of California.[2]

### A. The Ninth Circuit Consistently Has Held That The *De Minimis* Doctrine Applies Under California Law

Plaintiff inexplicably ignores current—and binding—Ninth Circuit authority confirming the

application of the *de minimis* doctrine to California Labor Code claims.  *See, e.g.*, *Corbin v. Time*

*Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1080 (9th Cir. 2016) (holding *de minimis*

doctrine applies to claims under the Cal. Labor Code because "'in light of the realities of the industrial

world,' a 'few seconds or minutes of work beyond the scheduled working hours ... may be

disregarded'"; "it is 'only when an employee is required to give up a substantial measure of his time and

effort that compensable working time is involved.'"); *Gillings v. Time Warner Cable LLC*, 583 Fed.

App'x 712, 713 (9th Cir. 2014) ("The employees argue that the *de minimis* doctrine does not apply to

claims of unpaid wages under California's Labor Code. **Not so.**") (emphasis added).

### B. The California Supreme Court Has Not Eliminated The *De Minimis* Doctrine

Plaintiff argues that the Ninth Circuit recently certified a question to the California Supreme

Court to determine whether the *de minimis* doctrine applies under the California Labor Code, in its

decision in *Troester v. Starbucks Corp.*, 2016 WL 8347245 at *3 (9th Cir. June 2, 2016).  (Dkt. No. 131,

12:7-16.)  Plaintiff then speculates that "the California Supreme Court could very well hold that the *de*

*minimis* doctrine does not apply at all, … especially given that modern technology can track time to the

---

[2] Plaintiff cites the decision in *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 262 (2016), for the proposition that California labor laws were enacted for "the protection of employees, particularly given the extent of legislative concern about working conditions, wages, and hours."  (Dkt. No. 131, 11:25-12:3.)  While it is well-established that state labor laws protect state employees, there is nothing in the *Augustus* decision—or any decision from any court—holding that increments of time of less than one minute must be paid to hourly workers.  Notwithstanding Plaintiff's contention that California law may provide greater protections, the *de minimis* doctrine still applies.  *See, e.g.*, *Rodriguez*, 2017 WL 4005591 at *7 ("Under current law, the *de minimis* doctrine is a valid defense to wage claims brought under the California Labor Code").  *Accord Hubbs v. Big Lots Stores, Inc.*, 2017 WL 2304751 at *8 (C.D. Cal. May 12, 2017) ("Notwithstanding that there may be further development of the law in this area, there are substantial similarities between the FLSA and the requirements of the California Labor Code. In light of these similarities, the existing Ninth Circuit decisions are sufficient to permit the required analysis in this case.").

2

41010899v.1

second." (Dkt. No. 131, 12:16-18.)

Plaintiff's speculation does not eliminate existing Ninth Circuit precedent. As the Court held in *Rodriguez*, 2017 WL 4005591 at \*7, "this Court does not have the benefit of a ruling from California's highest court that either alters or solidifies the validity of the *de minimis* doctrine outside of the FLSA context from which it originated." Thus, it is necessary to follow the current binding Ninth Circuit precedent, as the Court did in *Rodriguez*, 2017 WL 4005591 at \*7:

> In deciding the instant motion on summary judgment, this Court must operate in the present legal landscape and apply the law as it currently exists.
>
> Although these policy arguments are currently before the California Supreme Court in *Troester*, this Court declines [the] invitation to predict how the California Supreme Court will rule. [Plaintiff's] argument that California labor law is more "employee friendly" than its federal counterpart thus does not alter the Court's obligation to apply existing law and consider the applicability of the *de minimis* doctrine to the claims in this case.

*Id.* (citing *Hubbs*, 2017 WL 2304751 at \*8; *Gillings*, 583 Fed. App'x at \*713; *Cervantez v. Celestica Corp.*, 618 F. Supp. 2d 1208, 1217 (C.D. Cal. 2009)).

## III. IT IS UNDISPUTED THAT THE EXIT INSPECTIONS AT CONVERSE SATISFY ALL OF THE ELEMENTS OF THE *DE MINIMIS* DOCTRINE

The *de minimis* doctrine was established "to shield employers from having to pay trivial amounts of time worked off the clock by employees that would otherwise be compensable." *Rodriguez*, 2017 WL 4005591 at \*6 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946)). In order to determine if the amount of time at issue is *de minimis*, the Ninth Circuit has instructed courts to consider three factors:

(1) the practical administrative difficulty of recording the additional time;

(2) the aggregate amount of compensable time; and

(3) the regularity of the additional work.

*Lindow v. United States*, 738 F.2d 1057 (9th Cir. 1984); *accord Rodriguez*, 2017 WL 4005591 at \*6.

### A. It Is Undisputed That There Is A "Practical Administrative Difficulty" Of Recording And Compensating Time For Exit Inspections In Increments Of Seconds

Plaintiff argues that there can be no administrative difficulty in recording additional seconds of time worked by employees because the *de minimis* doctrine arose from the "pre-modern technology" that previously existed when "time clocks did not necessarily record the actual time worked by employees." (Dkt. No. 131, 11:12-16.) Plaintiff posits that modern technology now allows time to be

3

recorded in increments of seconds, and that modern technology also allows time clocks to be placed by the front end exit cash register so that employees may undergo an exit inspection before clocking out. (Dkt. No. 131, 20:1-11.)

### 1.    There Cannot Be A Triable Issue Based On The Technological Feasibility Of Recording Time By The Second

Plaintiff's unsupported argument that time clocks could not measure increments of one second at the time the *de minimis* doctrine was developed—even if true—is irrelevant.  The technological feasibility of recording time in increments of seconds is not part of the analysis.  In *Corbin*, 821 F.3d at 1081-1082, the Ninth Circuit directly rejected the argument that the ability to reconcile mere seconds of time defeated the *de minimis* doctrine—"[plaintiff's] contention that the *de minimis* doctrine does not apply because [the employer] **could** ascertain the exact log-in/out times by scouring its computer records is baseless; the *de minimis* doctrine is designed to allow employers to forego such an arduous task." *Id.* at 1082 (emphasis added).  *Accord Rodriguez*, 2017 WL 4005591 at \*14 ("In light of *Corbin*, which explicitly rejected plaintiff's technical feasibility argument as 'baseless' on this prong; [plaintiff's] evidence that [an employer] has the technical ability to change its timekeeping system is misplaced").

### 2.    There Cannot Be A Triable Issue Based On The Technological Feasibility Of Moving Time Clocks To Be Closer To The Store Exit

Plaintiff cannot dispute the business reasons for placing employee time clocks in the break rooms, rather than at the store exit.  As Converse's Fed. R. Civ. P. 30(b)(6) corporate representative testified at her deposition, there are undisputed business reasons for keeping time clocks at the back of house area of each store:

> One being for personnel reasons, so just the privacy of the associate. [T]here are other things that the employee will do on the time clock outside of punching in and out. They can request time off. They can review their punches. They can view their [paid time off] accruals. They can view their schedule. They can view their time card, and then they can view any messages from their manager. And so a lot of those things can take some time, and, you know, we just find it better to have everything in the back of house where it's -- they're uninterrupted by customers or just by the day-to-day happenings in a retail store.

(Kiefer Dep. III, 22:20-23:21.)  As Converse's corporate representative further testified, there are additional "customer experience reasons" for keeping time clocks in the employee break rooms:

> [F]rom a consumer experience perspective, … we would not want that activity to take place on a sales floor for a couple of reasons.

---

4

1   One, again, it's kind of a private, you know, moment. A lot of times the associates will do
2   those types of things on their break. And so, you know, they typically take their breaks in
    the back of the store, so it's just better for them -- it's actually a better associate
3   experience to have everything in one place.

4   And then on the consumer side, you know, we would never install any sort of technology
    on the sales floor that is not specific to a consumer. So I'll give you an example.
5   Registers, those are used to ring the customer up. We have merchandise locaters which is
    a piece of technology that we use to locate merchandise for a customer. It's actually hand-
6   held so it can't necessarily get lost or a consumer doesn't use it. But the last thing we
    would want is to have a piece of technology installed somewhere on the sales floor that
7   wasn't specifically used for a customer.

8   (Kiefer Dep. III, 23:22-24:24.)  Converse's corporate representative also explained that it would be

9   administratively impractical to place time clocks at the cash registers, which are often near the store exit:

10   Again, I would just say it would just be completely impractical.

11   The cash wrap is just that. It's to ring the customers out, and the last thing we want would
     be associates congregating at the point of sale, specifically if they're clocking out and
12   there's a line at the register. As an example, as a customer, I would be, you know, upset
     if, you know, there were folks that appeared to look for -- work for Converse behind a
13   cash wrap but not turning around to ring my transaction, so -- I guess the short answer is
     we would -- I just think it's completely impractical.

14   (Kiefer Dep. III, 39:11-40:7.)

15       In *Rodriguez*, 2017 WL 4005591 at *13, the Court found that nearly identical business reasons

16   supported the administrative impracticability of relocating time clocks.  In granting summary judgment

17   for the employer, the Court stressed:

18   Nike further argues that it is impractical to move its time clocks, which are currently
     located in the back of its retail stores, to the area of the store exits in the front where exit
19   inspections are conducted.

20   … Nike made the decision to keep its time clocks in the back of the store for business
     reasons.  [The Fed. R. Civ. P. 30(b)(6) corporative representative] testified that "[t]ime
21   clocks are best placed off the sales floor" due to privacy concerns related to the
     employees' information.  [T]here are benefits to placing the time clocks in the break
22   room, which allows employees to clock in and out after their break periods.

23   … Nike perceives a business benefit to keeping the time clocks solely in the break rooms,
     rather than in the front of the store.

24
     … In light of evidence in the record regarding Nike's timekeeping system and its business
25   considerations for having employees clock in and out in the break room, the Court finds
     that Nike has met its initial burden of production that it would be administratively
26   difficult to record the time spent on exit inspections.

27

28

5

41010899v.1

*Id.* As the Court explained, an employer has the right to make its own business decision as to where to put its time clocks. *Id.* Evidence that other retailers have moved their time clocks cannot refute a business decision that moving time clocks to the store exit would be administratively difficult:

> [Plaintiff's] evidence that Nike already utilizes two time clocks in break rooms in its busier stores, or that other retailers have decided to place an additional time clock by the store exit, does not refute Nike's evidence that such a change would be administratively difficult.

*Id. Accord Alvarado v. Costco Wholesale Corp.*, 2008 WL 2477393, at *3-4 (N.D. Cal. June 16, 2008) (holding that the administrative difficulty prong favored Costco, and rejecting plaintiff's argument that "merely by repositioning the time clock close by the exit door, Costco could more accurately measure the amount of time its employees were on the job").[3]

## B. It Is Undisputed That The "Aggregate Amount Of Time" Off The Clock For Each Exit Inspection Is Merely Seconds And Certainly Less Than A Daily Aggregate Of 10 Minutes

Plaintiff argues that "the deposition testimony from nine long-time Converse employees from locations all over the state establish[es] that the security checks frequently took minutes." (Dkt. No. 131, 10:26-27.)[4] Plaintiff also submits a report from an expert witness, Dr. Brian Kriegler, concluding that, based on depositions of 12 class members, "the average Combined Times (including time from when they clock out until they walk to the front of the store) is 144 seconds." (Dkt. No. 132, ¶ 33, 13:9-

---

[3] Theoretically, if the time clocks were moved so that they would be next to the store exit, employees would not have to walk from the break room to the exit after clocking out. Plaintiff contends that this "walk time" is compensable, because employees are still in the store and "subject to the control of" Converse. (Dkt. No. 132, ¶ 26, 9:17-10:3.)

This argument is silly. The laws of California—and the laws of common sense—do not require an employer to pay for time spent "walking" out of the workplace. The time an employee spends walking away from his or her workstation cannot constitute paid time, whether it involves an employee walking to the exit of a retail store, or an employee traveling on an elevator to leave a high-rise office building, or an employee in a grocery store walking to their car in the company parking lot. *See Chavez v. Angelica Corp.*, 2014 WL 6973497, at *10 (Cal. Ct. App. Dec. 10, 2014) ("we note plaintiffs are unable to cite to any case or statute holding that employers must add walking time … nor have we found any such law based on our independent research").

[4] Plaintiff refers to the testimony of nine class members, but fails to mention that deposition transcripts from 15 class members were available at the time his opposition papers were filed. (Supp. Crandall Decl., ¶¶ 30-31.) Based on the deposition testimony selected by Plaintiff, at least 40% of the witnesses testified that they **never** had an exit inspection that lasted longer than 60 seconds. Among the 60% who said they had an exit inspection of "minutes," Plaintiff offers no evidence about the number or frequency of such inspections—it could have been only once for any of these "long-time" employees.

DEFENDANT'S REPLY MPA ISO MOTION FOR SUMMARY JUDGMENT

11.)  However, even if the security checks took "minutes" or 144 seconds on a class-wide basis, the amount of time offered by Plaintiff is still *de minimis*.[5]

### 1. There Cannot Be A Triable Issue Based On An Aggregate Amount Of Off-The-Clock Time That Is Less Than 10 Minutes Per Day

The *de minimis* doctrine is based on "a balance between requiring an employer to pay for activities that it requires of its employees and the need to avoid 'split-second absurdities' that 'are not justified by the actuality of the working conditions.'" *Rodriguez*, 2017 WL 4005591 at *10 (citing *Rutti v. Lojack Corp., Inc.*, 596 F.3d 1046, 1057 (9th Cir. 2010) and *Lindow*, 738 F.2d at 1052).

The Ninth Circuit has set an objective and quantifiable **daily** amount of time that can be considered *de minimis*. *Rodriguez*, 2017 WL 4005591 at *11 (citing *Lindow*, 738 F.2d at 1062). Although "common sense must be applied to the facts of each case, … **courts have regularly held that daily periods of up to 10 minutes are** ***de minimis***." *Id.* (emphasis added; citing *Lindow*, 738 F.2d at 1062 (collecting cases)). *Accord Hubbs*, 2017 WL 2304751 at *8 ("Periods of approximately **ten minutes per day** may be properly treated as *de minimis*"); *Alvarado*, 2008 WL 2477393 at *3-5 ("numerous courts [have] held that an additional **daily period** of approximately **10 minutes** is considered *de minimis* even though otherwise compensable").

At best, Plaintiff argues that the time spent in exit inspections is "minutes" or "144 seconds" or two minutes and 24 seconds.  (Dkt. No. 131, 10:26-27; Dkt. No. 132, ¶ 33, 13:9-11.)  Even if class members had multiple daily exits, the numbers offered by Plaintiff do not amount to more than 10 minutes per day.  As the Court explained in *Rodriguez*, 2017 WL 4005591 at *15, a triable issue cannot be based on "a hypothetical experience [that] is neither found in the evidence or plausible":

> Drawing all reasonable inferences in favor of [plaintiff], the daily amount of time is still well within the 10-minute *de minimis* threshold.

> Even if an exit inspection occasionally lasts a few minutes, and an employee exits twice a day (once for a meal/rest break, and once at the end of the workday, as Dr. Kriegler suggests), an employee would still spend less than 10 minutes a day in connection with exit inspections. If the Court assumes that an employee leaves more than twice a day, which there is no evidence to support, it would still take multiple exits to reach 10 minutes per day.

> For example, an employee would have to undergo a two-minute exit inspection five times

---

[5] Plaintiff's opposition does not define "minutes" to mean two minutes, or three minutes, or four minutes.  Rather, there is simply an unspecified reference to "minutes."  (Dkt. No. 131, 10:26-27.)

a day, or a three-minute inspection four times a day, in order to surpass 10 minutes of "daily" time spent undergoing exit inspections. And such a hypothetical experience is neither found in the evidence nor plausible.

> **2.    There Cannot Be A Triable Issue Based On Plaintiff's Expert's Calculation Of The "Average Midpoint" Of 144 Seconds, Or Two Minutes And 24 Seconds, Of Off-The-Clock Time**

Plaintiff's expert claims that he "selected a random sample of 25 class members to testify in deposition." (Dkt. No. 132, ¶ 32, 12:15-16.)  At the time he prepared his report, Plaintiff's expert relied on the deposition testimony of 12 class members.  (Dkt. No. 132, ¶ 6, 1:25-2:2, ¶ 33, 13:9-11.)  Plaintiff's expert then determined a "combined time" for exit inspections.  (Dkt. No. 132, ¶ 14, 4:7-10.)  The "combined time" calculated by Plaintiff's expert is the "travel time between clocking out and the front of the store, time spent waiting for a manager to perform the security check, and time spent underdoing the check."  (Dkt. No. 132, ¶ 14, 7-10.)

Plaintiff's expert then analyzed the "midpoint" of the ranges of time by taking an average of those ranges, which amounts to 144 seconds:

> Q. Your Exhibit 5 to the report says that the average time for exit inspections is 144 seconds, right?
>
> A. My analysis shows that if you take the midpoint of the typical ranges provided by the deponents and I took the average of those, it comes to 144 seconds.

(Kriegler Dep., 9:25-10:6.)  As a matter of law, 144 seconds, or two minutes and 24 seconds, is *de minimis*.  *Rodriguez*, 2017 WL 4005591 at *11 (citing *Lindow*, 738 F.2d at 1062).

> **3.    There Cannot Be A Triable Issue Based On Plaintiff's Expert's Corrected Calculation Of The "Weighted Average Midpoint" Of 114 Seconds, Or One Minute And 54 Seconds, Of Off-The-Clock Time**

At his deposition, Plaintiff's expert conceded that his "average midpoint" of 144 seconds was "based on weighing each witness equally, regardless of the number of days that they worked."  (Kriegler Dep., 111:20-112:2.)  Plaintiff's expert then agreed to "re-run his numbers," in order to "weigh the number of days worked per witness proportionately … so that their numbers would be reflected in a weighted average."  (Kriegler Dep., 112:3-12.)  When correctly accounting for the number of days worked by each witness, the "weighted average" for the midpoint was reduced by 30 seconds, from 144 seconds to 114 seconds:

> Q. What is the weighted average for the midpoint number that you used?

8

41010899v.1

1      A. I have come up with 114 seconds.

2      Q. And so the weighted average for the midpoint is 30 seconds lower than the amount of
       time in your report?

3

4      A. The weighted average is 30 seconds less.

5  (Kriegler Dep., 113:18-24.)  When properly accounting for the "weighted average" of the midpoint for

6  exit inspections, the amount of time spent is under two minutes:

7      Q. So the -- the weighted average of the midpoint for the exit inspections is less than two
       minutes?

8      A. Just under two minutes.

9  (Kriegler Dep., 114:16-19.)  As a matter of law, 114 seconds, or one minute and 54 seconds, is *de*

10 *minimis*.  *Rodriguez*, 2017 WL 4005591 at *11 (citing *Lindow*, 738 F.2d at 1062).

11         **4.      There Cannot Be A Triable Issue Based On Plaintiff's Expert's Corrected
                     Calculation Of The Weighted Average "Low-End" Of 38 Seconds Of Off-
12                   The-Clock Time**

13         Plaintiff's expert then conceded that, when correctly accounting for the actual number of days

14 worked, the "low-end" of the range was 38 seconds.  (Kriegler Dep., 114:3-5.)  At 38 seconds, the

15 weighted average for the "low-end" of the midpoint of the combined time for exit inspections is less

16 than one minute:

17     Q. And the weighted average for the low end of bag check inspections is 38 seconds, or
       less than a minute?

18
       A. Correct.
19

20 (Kriegler Dep., 114:24-115:2.)  Plaintiff's expert admitted that, based on all of his calculations, the

21 "low-end" of 38 seconds would be the **most reliable** amount of time for calculating class-wide exit

22 inspections:

23     Q. Dr. Kriegler, based on all the evidence that you have been able to gather so far, which
       of your numbers is the most reliable to be used to predict the actual amount of time spent
       in these security exit inspections across the entire class?
24

25     A. I think one of my calculations would be based on the low end for each person in the
       sample.

26 (Kriegler Dep., 189:1-6, 9-11.)  When pressed further at his deposition, Plaintiff's expert admitted that

27 the "low-end" of the weighted average of 38 seconds was the better number to be predictive in showing

28 the actual amount of time spent, and he did not know of a more reliable number to offer:

41010899v.1

> Q. I understand. But I'm asking you, as a statistical determination, which number is better to be predictive in showing the actual amount of time? You can't answer whether it's the -- the weighted low end or the weighted average, right?
>
> A. **The low end numbers for people in the sample**, I expect to be basing one set of damages calculation on those -- on those -- on those results. Beyond that, as I sit here today, I don't know.

(Kriegler Dep., 190:16-191:2; emphasis added.)  Indeed, Plaintiff's expert conceded that he would "never" use his alternative "midpoint" or "high-end" numbers as a predictor of the amount of time spent in exit inspections on a class-wide basis:

> That's why I provide the numbers that I do three different ways. That's exactly why I have a low end, a high end, and a midpoint.
>
> It's all about how you use this. I never said that I was going to use this midpoint as an extrapolation. Maybe you think I am, but I never said I was going to do that.

(Kriegler Dep., 110:19-21, 23-111:1.)  As a matter of law, 38 seconds is *de minimis*.  *Rodriguez*, 2017 WL 4005591 at *11 (citing *Lindow*, 738 F.2d at 1062).

### 5.      There Cannot Be A Triable Issue Based On A Corrected Calculation Of The "Midpoint" Weighted Average Of 32.52 Seconds Of Off-The-Clock Time

When pressed even further at his deposition, Plaintiff's expert admitted that his calculations did not account for the percentage of exits that took a particular duration of time, within a given range. (Kriegler Dep., 106:10-14.)  More specifically, Plaintiff's expert admitted that his "midpoint" weighted average was merely based on the range of time reported by a witness, without accounting for how many exits were at the "low-end" or "high-end."  (Kriegler Dep., 109:18-110:3, 5-12; 216:10-20.)

Ultimately, Plaintiff's expert admitted that it would be statistically sound to apply the percentage of time assigned to different exit inspections, and then apply a weighted average based on the number of workdays for each class member, in order to determine the best predictor of the class-wide amount of time spent:

> Q. [I]f the methodology is to apply the witness's testimony saying, here is the percentage of time different parts of the inspection process took, and then using that number with a weighted average based on their workdays, based on the 15 deposition transcripts that we have available, this would be a sound statistical methodology for trying to arrive at the average amount of time spent per bag check?
>
> A. The approach, yeah.

(Kriegler Dep., 216:25-217:8, 11.)  Plaintiff's expert was then presented with a new calculation based on the methodology described above.  The new calculation showed a weighted average, which also

accounted for the percentage of time spent at each end of the range.  This new calculation resulted in 32.52 seconds as the class-wide amount of time spent for exit inspections.  **Plaintiff's expert conceded that an average of 32.52 seconds was statistically sound**:

> Q. If I'm trying to find out the average amount of time spent per bag check, this methodology on Exhibit 306 that uses a weighted average with the result of 32.52 seconds is statistically sound, based on the data available, right?
>
> A. The approach that you're taking here. I understand what you are doing, and it seems like a logical approach.

(Kriegler Dep., 215:14-21.)  The calculations supporting the average of 32.52 seconds are set forth in the Supplemental Declaration of Robert W. Crandall, filed herewith.  (Supp. Crandall Decl., ¶¶ 37-109.)  As a matter of law, 32.52 seconds is *de minimis*.  *Rodriguez*, 2017 WL 4005591 at *11 (citing *Lindow*, 738 F.2d at 1062).

      **6.**      **There Cannot Be A Triable Issue Based On Any Time Estimate Offered By Plaintiff's Expert, Because He Admitted That His Calculations Are Not Meant To Be Representative On A Class-Wide Basis**

Notwithstanding that Plaintiff's expert offered numerous time estimates based on deposition testimony of selected class members, he admitted that his analysis was **not meant to offer any alternative calculations**, or his own study of the amount of time spent in exit inspections on a class-wide basis.  Instead, Plaintiff's expert testified that he was merely engaged to critique the report prepared by Converse's expert, Robert W. Crandall:

> Q. You were engaged by counsel for the certified class to do a study regarding the exit inspections at the Converse stores in California?
>
> A. **I wasn't asked to do a study. I was asked to evaluate the -- the purpose of my report was to evaluate the work of Mr. Crandall.**

(Kriegler Dep., 9:1-9; emphasis added.)  Plaintiff's expert concedes that his analysis is not be representative of the entire class, because his analysis is still "in progress":

> Q. Your report or declaration is not meant to include an average amount of time that can be extrapolated to the entire class, correct?
>
> A. Correct.
>
> Q. And so if the court were to ask, Where can I find on behalf of plaintiff an average amount of time that can be extrapolated to the entire class, your answer would be, That information has not been gathered yet?
>
> A. It has not been gathered yet.

11

Q. If a court were to ask, Has plaintiff offered any average or mean or median amount of time for exit inspections that can be extrapolated to the entire class, the answer would be, That information has never been offered?

A. Yes. It's still in progress, yeah.

(Kriegler Dep., 60:14-61:4.)  Plainly put, Plaintiff's expert admitted that he has no alternative analysis that can be extrapolated on a class-wide basis.  At best, he can merely criticize the methodology or conclusions reached in the Crandall Study.  This is not enough to avoid summary judgment.

As explained by the Court in *Rodriguez*, 2017 WL 4005591 at *9, there is no "battle of experts" to be determined by a trier of fact where a plaintiff's expert simply points out flaws in the methodology of a defendant's expert, without providing conflicting evidence.  In rejecting a similar report prepared by the same plaintiff's expert, the Court stated:

> Dr. Kriegler does not present any evidence on the *de minimis* doctrine that could create a genuine issue of material fact as to the length of the exit inspections. Rather, he uses his expertise to "expos[e] the flaws" of the evidence offered by Nike. …
>
> [Plaintiff's] attempt to equate this situation to a battle of experts sufficient to deny summary judgment is misguided. If this strategy is to be accepted, then all a party needs to do to defeat summary judgment is to hire an expert to point out flaws in the other side's evidence, without offering any conflicting evidence for the jury to consider at trial on the relevant claim or defense. Once the moving party has met its initial burden, if the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment.

*Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

**C.    It Is Undisputed That The Crandall Study Can Be Extrapolated On A Class-Wide Basis To Show That The Average Amount Of Time Spent For Exit Inspections Is 23.4 Seconds**

Although Plaintiff concedes that the Crandall Study is based on "a review of security checks from ten Converse locations," he claims that the study is not representative of the entire class because video and in-person observations were taken for "only a small two-week window between May 17 and May 31, 2017." (Dkt. No. 131, 2:13-17.)  Plaintiff then concludes that the Crandall Study cannot be "applied to every class member and extrapolated out across the entire class period dating back to July 2011." (Dkt. No. 131, 2:19-22.)

**1.    The Crandall Study Is Representative, Given That The Exit Inspection Procedures Remained The Same During The Entire Class Period**

Plaintiff's argument that the Crandall Study cannot be extrapolated was directly rejected by the Court in *Rodriguez*, 2017 WL 4005591 at *3, 16, 17.  In *Rodriguez*, 2017 WL 4005591 at *3, the

41010899v.1

1    Crandall Study involved "a random sampling of 15 out of the 34 Nike retail stores in California,

2    representing 44% of the stores in the state."  In the present case, the Crandall Study involved a random

3    sampling of 10 out of the 22 Converse retail stores in California, representing 45% of the stores in the

4    state.  (Dkt. No. 118-3, ¶ 34.)  In *Rodriguez*, 2017 WL 4005591 at *3, the Crandall Study analyzed exits

5    "over a period of two full days."  In the present case, the Crandall Study analyzed exits over a period of

6    two to three full days.  (Dkt. No. 118-3, ¶¶ 40, 46.)  Thus, the Crandall Study here was at least as

7    comprehensive—or perhaps more comprehensive—than the Crandall Study in the *Rodriguez* case.

8            In *Rodriguez*, 2017 WL 4005591 at *4, the Crandall Study showed that "the average amount of

9    combined time for an exit inspection was **18.5 seconds**."  (Emphasis added.)  Based on the results of the

10   Crandall Study, the Court in *Rodriguez* found that the study involving two days of exits could be

11   extrapolated to the entire class period dating back to February 25, 2010.  *Rodriguez*, 2017 WL 4005591

12   at *2.  As the Court stated, "[i]t is undisputed that an exit inspection generally takes a few seconds, but

13   can take up to a few minutes.  It is also undisputed that compensable exit inspections lasting 60 seconds

14   or more were irregular, and the only reasonable inference from the evidence is that the daily and

15   aggregate amount of compensable time is small."  *Rodriguez*, 2017 WL 4005591 at *17.

16           In the present case, the Crandall Study shows that the average combined time for exit inspections

17   is **23.4 seconds**.  (Dkt. No. 118-3, ¶ 126, 22:10-11.)  The Crandall Study also shows that "95.4% ... of

18   exits have a total time that is less than one minute."  (Dkt. No. 118-3, ¶ 118, 21:9-10.) The Crandall

19   Study also shows that "23.9% … of the exits were employee 'walk-outs' where no measurable time for

20   waiting, visual inspection, bag checks, or 'other' time was observed."  (Dkt. No. 118-3, ¶ 125, 22:3-8.)

21   Just as the results and methodology of the Crandall Study could be extrapolated to the entire class in the

22   *Rodriguez* case, the results and methodology of the Crandall Study can be extrapolated to the entire class

23   in the present case.

24           **2.      If This Lawsuit Is Amenable To Class Certification, It Necessarily Means
25                    That Common Policies Or Practices Existed Throughout The Class Period,
                     So That The Crandall Study Is Representative Of The Entire Class Period**

26           When seeking class certification, Plaintiff's counsel argued that there has been a common policy

27   and practice of conducting exit inspections for all employees at Converse for the entire class period—

28   "my understanding, Your Honor, is that the policy has not changed.  And so on that basis, there would

13

1    be no reason to cut off the class anyway, on that basis." (Class Certification Hearing Transcript, 14:1-

2    3.) Also, even though the named plaintiff only worked for a portion of the time during the class period,

3    Plaintiff's counsel argued that the claims were typical of the entire class—"there's no dispute he was

4    employed within the class period and he was subject to Defendant's security check policy. There's

5    nothing about him that distinguishes him from any other employee." (Class Certification Hearing

6    Transcript, 15:16-19.)

7         Plaintiff's expert also admitted that "there wasn't any change in the exit inspection policy from

8    store to store." (Kriegler Dep., 66:8-11.) Plaintiff's expert also admitted that "there wasn't any change

9    in the exit inspection policy from one day or one week or one month or one year to another." (Kriegler

10   Dep., 66:16-20.) When granting class certification, the Court relied on the representations of Plaintiff's

11   counsel, which were then later confirmed by Plaintiff's expert. The Court held that "[Plaintiff] has

12   demonstrated that most, if not all, Converse stores are set up such that an employee would necessarily be

13   off-the-clock when a bag check occurs. Thus, there are common questions of fact and law and that the

14   answers to those questions will drive resolution of the litigation." (Dkt. No. 89, 3:22-25.)

15        If Plaintiff now argues that the data or conclusions in the Crandall Study are somehow at odds

16   with the experiences of all employees during the entire class period, then it necessarily follows that

17   uniform common policies or practices did not exist during the entire class period. If Plaintiff's argument

18   is correct, then the class must be decertified.[6]

19        **D.    It Is Undisputed That The "Regularity Of Additional Work" Is *De Minimis***

20        Plaintiff argues that "there can be no serious claim that the unpaid time at issue is not regular."

21   (Dkt. No. 131, 24:20-21.) Plaintiff contends that non-*de minimis* time off the clock is "regular" because

22   "it was Defendant's policy that every class member was required to undergo a security check every time

23   they left the store, meaning that every class member incurred at least one security check per day

24   worked." (Dkt. No. 131, 24:22-24.) Again, Plaintiff's argument was directly rejected in *Rodriguez*,

---

[6] Plaintiff speculates that Converse "could have adjusted its security check process, particularly after the granting of class certification." (Dkt. No. 131, 3:27-28.) Yet, Plaintiff offers no evidence showing that the time spent in exit inspections was impacted after the lawsuit was filed in 2015 or after class certification was granted in 2016. Although Plaintiff references two class members who believed that there was "a greater emphasis on speeding the checks up," this is not supported by any empirical evidence or any of the other multiple witnesses who were subject to deposition. (Dkt. No. 131, 4:3-8.)

14

41010899v.1

2017 WL 4005591 at *17:

> [Plaintiff] does not present any evidence to create a triable issue of fact on the regularity of the additional time. [Plaintiff] relies solely on his argument that the "unpaid work" is regular because employees are required to undergo a security check every time they leave the store.

> The Court declines to interpret the regularity prong of the *Lindow* test in such a manner. Rather, **the proper consideration is the regularity of exit inspections that were compensable**. *See Lindow*, 738 F.2d at 1064 ("[A]lthough plaintiffs reported early on a regular basis, they did not regularly engage in compensable activities."); *see also Corbin*, 821 F.3d at 1082. The Ninth Circuit further noted in *Lindow* that "the uncertainty of how often employees performed the tasks and of how long a period was required for their performance are also relevant" on the regularity prong. 738 F.2d at 1063.

*Id.* Although the Court in *Rodriguez* noted that some employees had "wait times and bag checks [that] could take several minutes in some instances," there was "no evidence that such lengthy inspections occurred with regularity." *Rodriguez*, 2017 WL 4005591 at *17. The Court found that "the Crandall Report demonstrates that exit inspections lasting 'several minutes' … were also not regular." *Id.* Despite a handful of longer exit inspections, the Court found that plaintiff "fail[ed] to offer evidence to create a genuine issue of material fact that **compensable** exit inspections occurred regularly." *Id.*

In the present case, the Crandall Study similarly found that "95.4% ... of exits have a total time that is less than one minute" and "23.9% … of the exits were employee 'walk-outs' where no measurable time for waiting, visual inspection, bag checks, or 'other' time was observed." (Dkt. No. 118-3, ¶ 118, 21:9-10, ¶ 125, 22:3-8.) Under the analysis recently set forth in *Rodriguez*, 2017 WL 4005591 at *17, there can be no triable issue that as to whether the compensable or non-*de minimis* exit inspections occurred on a regular basis.

## IV.   <u>CONCLUSION</u>

For all the reasons stated above, summary judgment should be granted against the certified class on the grounds that it is undisputed that any time spent off-the-clock in connection with exit inspections is *de minimis*, as a matter of law.

DATED: September 20, 2017              Respectfully submitted,

SEYFARTH SHAW LLP

By:    */s/ Jon D. Meer*
Jon D. Meer
Attorneys for Defendant